799 P.2d 821

**STATE of Arizona, Petitioner,**

v.

**Hon. Bernardo P. VELASCO, Judge of Superior Court, In and For the County of Pima, State of Arizona, Respondent,**

and

**Edward Anthony ALDAY, Real Party in Interest.**

**No. CV–89–0303–SA.**

Supreme Court of Arizona,
En Banc.

Sept. 19, 1990.

Reconsideration Denied Nov. 14, 1990.

Stephen D. Neely, Pima County Atty. by Jill Thorpe, Tucson, for petitioner.

Barbara C. Sattler, Tucson, for real party in interest.

Michael J. Bloom, P.C. by Michael J. Bloom and Stephen Paul Barnard, P.C. by Stephen Paul Barnard, Tucson, for amicus curiae Arizona Attys. for Crim. Justice.

Lowell D. Hamilton, Mesa City Prosecutor by Kevin R. Hays, Mesa, amicus curiae.

Roderick G. McDougall, Phoenix City Atty. by L. Michael Hamblin, Phoenix, for amicus curiae Phoenix City Prosecutor.

## OPINION

FELDMAN, Vice Chief Justice.

We accepted jurisdiction of this special action [1] to examine the requirements of due process in connection with scientific testing of breath to determine blood alcohol concentration (BAC) of those arrested for driving under the influence (DUI). The specific crime we consider is a violation of A.R.S. § 28–692(B), which forbids driving with a BAC of .10 percent or higher. The state asks us to reexamine and abolish or modify the rule requiring that a DUI defendant be given a sample of his breath for independent testing, the results of which *may* provide defendant with evidence to contradict the state's test results. *See Baca v. Smith*, 124 Ariz. 353, 604 P.2d 617 (1980); *Scales v. City Court*, 122 Ariz. 231, 594 P.2d 97 (1979).

We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(1), and Rules 4(a) and 7(a), Ariz.R.P.Spec.Act., 17B A.R.S.

## FACTS

On November 8, 1988, defendant Edward Anthony Alday (Alday) was stopped while driving in the town of Oro Valley. Officer Buvik of the Oro Valley Police Department pulled Alday over at approximately 12:41 a.m. after observing him speeding. The officer noticed that Alday smelled of alcohol, his eyes were bloodshot and watery, his speech was slurred, and he had difficulty standing. Alday also performed poorly on the field sobriety tests. The officer informed Alday of the Implied Consent Law (A.R.S. § 28–691) and Alday agreed to submit to a breath test. Officer Buvik, a Department of Health Services (DHS) certified Intoxilyzer operator, administered the test on a DHS certified Intoxilyzer, using a DHS certified checklist. Before administering the test, the officer observed Alday for twenty minutes, as required by statute, to ensure he did not put anything into his mouth or burp or vomit alcohol into his mouth. *See* A.R.S. § 28–692.03(A)(3). The test results showed Alday had a .195 percent BAC. Officer Buvik informed Alday of his right to a breath sample for independent testing. At Alday's request, Officer Buvik captured the sample in a silica gel tube. Alday was then advised of his right to obtain an independent blood alcohol test.

Alday was charged with four felonies: third offense driving while under the influence, in violation of A.R.S. § 28–692(A), § 28–692.01(F); third offense BAC, in violation of A.R.S. § 28–692(B), § 28–692.01(F); DUI while license suspend-

1. In Arizona, relief formerly obtained by writs of prohibition, mandamus, or certiorari is now obtained by "special action." Rule 1, Arizona Rules of Procedure for Special Actions, 17B A.R.S.

ed, cancelled, revoked, refused, or under restriction, in violation of A.R.S. § 28–692(A), § 28–692.02(A)(1); and BAC while license suspended, cancelled, revoked, refused, or under restriction, in violation of A.R.S. § 28–692(B), § 28–692.02(A)(1).

The case was assigned to respondent, the Honorable Bernardo P. Velasco, Judge of the Pima County Superior Court. Alday filed a pretrial motion to suppress the results of the breath alcohol test administered at the time of his arrest, contending that the silica gel method of capturing the breath sample to be provided to arrestees is unreliable and therefore deprived him of a crucial source of evidence to challenge the state's BAC evidence. Because of the alleged unreliability of the captured breath sample, Alday argued that the state violated the requirements for preserving evidence set out in *Baca*, which holds that when a sample of a suspect's breath is consumed in the analysis and a request is made, another sample must be taken and preserved for the suspect.[2]  124 Ariz. at 356, 604 P.2d at 620.

Judge Velasco granted the motion to suppress, stating:

> IT IS THE FINDING OF THE COURT that where the State takes a test which it believes to be valid and reliable, advises the Defendant of his right to have his own test, provides him with a sample of the State's test, but which is otherwise deficient for testing purposes, that under those circumstances, the Defendant is entitled to suppression of the State's test for the following reasons:
>
> 1) The invalid test is an inducement to forego what could be a valid independent test; and
>
> 2) That where the State assumes an obligation to provide a sample for comparison, it must provide a valid sample.

Minute Entry, July 3, 1989.

The state filed this original special action proceeding, asking us to accept jurisdiction

and hold that Judge Velasco abused his discretion in granting the motion to suppress the results of the Intoxilyzer test. The state also asks that we modify or overrule *Baca v. Smith*.

## JURISDICTION

Special action relief generally is available only when the petitioner does not have an adequate remedy by appeal. Although the state concedes that it may appeal from an order suppressing evidence (A.R.S. § 13–4032), it contends that this is not an adequate remedy in the present case, where the reliability of the silica gel method of breath preservation is under attack. Silica gel preservation is the method used in much of the state, with the notable exceptions of Phoenix and Mesa, to comply with the mandates of *Baca*.

The state claims there has been a "flood" of motions to suppress breath alcohol results, with the majority of these being granted. The state opposes these motions, and suppression orders are being appealed through superior court and the court of appeals. Given the number of cases affected, we believe the legal issue is of statewide importance and principles of judicial efficiency require that it be decided in a single proceeding and as quickly as possible. We therefore accepted jurisdiction and stayed further proceedings in the trial court. *See* Rules 5 and 7, Ariz.R.P.Spec. Act., 17B A.R.S.

## BREATH CAPTURE PROCEDURES IN ARIZONA

### A. Methods of Breath Testing

#### 1. *Primary Breath Testing Instruments*

Arizona law enforcement agencies use three types of primary breath testing in-

---

**2.** From the record before us, it appears that Alday does not claim, at least at this stage, any specific error in the taking of his sample, its preservation, or testing. His evidence and argument in the trial court and in this court address only the inherent reliability and validity of the silica gel methodology. Presumably, therefore, the trial court's order was based on generalized unreliability of the test rather than any specific error in the testing process. This opinion is similarly directed.

struments to determine breath alcohol pursuant to the Implied Consent Law, A.R.S. § 28–691: the Breathalyzer, the Gas Chromatograph Intoximeter (GCI), and the Intoxilyzer. The majority of jurisdictions in Arizona use the Intoxilyzer. All three primary breath testing devices test the breath at the time the specimen is taken. The devices are labeled as "primary" simply because the sample is captured and tested immediately.

The Intoxilyzer is the device used in this case. In an Intoxilyzer test, the suspect blows a sample of deep lung air through a mouthpiece and tubing into the machine, which uses infrared spectroscopy to examine the amount of ethyl alcohol present and converts this into a breath alcohol concentration reading of grams of alcohol per 210 liters of breath. The results are converted into BAC. Technically, the test does not consume the specimen. Although the original devices discharged the specimen into the air, the silica gel system used in this case captures and preserves the specimen for later retesting. The results of the retest may be compared with the results of the original Intoxilyzer test to verify the state's results.

### 2. *Breath Preservation Methods*

Breath preservation testing differs from primary testing methods in that the devices employed capture and preserve the breath for later testing. Two breath preservation methods are certified for use in Arizona: silica gel and indium. Silica gel is the method that was used in this case. The silica gel method utilizes a glass tube containing silica gel crystals. Silica gel is a highly absorbent substance that attracts and captures moisture. Because the Intoxilyzer does not destroy the breath sample as it analyzes it, the same specimen of breath analyzed in the state's test is blown over the silica gel on completion of the primary test. The tube is then sealed and given to the defendant for later, independent analysis.

### 3. *DHS Regulation*

DHS promulgated a series of regulations intended to guarantee the accuracy and

reliability of breath *testing* instruments used in Arizona. *See* A.A.C., DHS Regulations, Art. 4: Determination of Blood Alcohol Content, R9–14–401 to R9–14–412 (supplemented and renumbered March 31, 1987). To be certified, all primary breath testing instruments must initially be able to meet a plus or minus five percent error factor. DHS Regulation R9–14–404(B)(3). The state must demonstrate that the instrument was working properly and accurately before and after the suspect's test for the results to be admissible. A.R.S. § 28–692.03. Subsequent to certification, DHS also requires that each machine be calibrated to a ten percent error factor every one hundred subjects or monthly. DHS Regulation R9–14–405(A)(3). A more involved Function and Accuracy check is required quarterly. *Id.* The records establishing compliance with these requirements are available to a defendant for checking and, if necessary, evidentiary use.

In addition to the regulations designed to guarantee the accuracy and reliability of the instrument itself, operators of the instruments must be certified pursuant to A.R.S. § 28–692.03 and DHS Regulation R9–14–407 and must follow the checklist developed by DHS for each instrument for the test results to be admissible in court. DHS Regulation R9–14–405(B) and (C). To establish admissibility, the operator must observe a DUI suspect for twenty minutes before performing a breath test to rule out the presence of mouth alcohol that might affect the accuracy of the test. A.R.S. § 28–692.03.

DHS also regulates the methods of breath *preservation* used in Arizona. Pursuant to DHS regulations, all preservation devices must also initially meet a plus or minus five percent error rate to be certified. Both the silica gel and indium methods of preserving secondary samples have been certified pursuant to DHS Regulation R9–14–404(C) and (G). DHS regulations also require quarterly testing of collection devices used to preserve breath alcohol samples to ensure proper sample collection. DHS Regulation R9–14–405(A)(3).

Having examined the methods and rules for operating breath testing devices, we turn momentarily to our previous decisions.

## B. Arizona Case Law

Arizona DUI defendants first challenged the requirements of breath capture as violating the fourteenth amendment due process clause in *Scales.* Defendants asserted that the due process clause required police officers to retain Breathalyzer ampoules so subjects of the test could inspect them. *Scales,* 122 Ariz. at 233, 594 P.2d at 99. They contended that because information material to their cases might be obtained from the ampoules, destruction of these ampoules was prejudicial. Speaking through Justice Holohan, we agreed, stating:

> Destruction of the ampoule deprives the defendant of a crucial source of evidence with which to attack the validity of the test reading and hence the presumption [of intoxication]. In light of the obvious importance to the petitioners of being able to rebut the presumption of intoxication, we hold that destruction of the ampoule was prejudicial to the defense [to such an extent it violated the constitutional guarantee of due process].

*Id.* at 234, 594 P.2d at 100. We found the proper remedy, where the ampoules were discarded, was suppression of the Breathalyzer results. *Id.* at 235, 594 P.2d at 101.

Shortly after *Scales,* Arizona DUI defendants mounted another due process attack regarding the requirements of breath capture. *See Baca,* 124 Ariz. 353, 604 P.2d 617. The instrument involved in *Baca* was a GCI, which destroys the breath sample it tests. Defendants asked us to determine "whether, when a sample of a suspect's breath is consumed in the [gas chromatograph] analysis, [due process requires that] another sample must be taken and preserved for the private use of the suspect." *Id.* at 354, 604 P.2d at 618. Speaking through Chief Justice Struckmeyer, we concluded:

> The failure of the state to collect and preserve evidence when those acts can be accomplished as a mere incident to a procedure routinely performed by state agents, is tantamount to suppression of that evidence. It is incumbent upon the state to employ regular procedures to preserve evidence which a state agent, in the regular performance of his duties, could reasonably foresee "might be favorable to the accused. [citations omitted]"

*Id.* at 355, 604 P.2d at 619 (quoting *Garcia v. District Court,* 197 Colo. 38, 589 P.2d 924, 929–30 (1979)).

We stated, therefore, in *Baca* that:

> [T]he right to test incriminating evidence where the evidence is completely destroyed by testing becomes all the more important because the defense has little or no recourse to alternate scientific means of contesting the test results, and therefore, *when requested,* the police must take and preserve a separate sample for the suspect by means of a field collection unit.

*Id.,* 124 Ariz. at 357, 604 P.2d at 620 (emphasis added).

Subsequent to *Baca,* we acknowledged that generally the state is not obligated to assist a suspect in gathering potentially exculpatory evidence, but held that the unique circumstances surrounding DUI arrests required an exception. *Montano v. Superior Court,* 149 Ariz. 385, 389, 719 P.2d 271, 275 (1986). Speaking through Vice Chief Justice Gordon, we noted that the only objective evidence in a DUI case is "inherently evanescent and virtually dispositive of guilt or innocence" and may be easily collected. *Id.* We held in *Montano,* therefore, that due process requires the state to inform a suspect of his right to an independent test for BAC, even where the state does not invoke the implied consent law and conduct its own chemical test. *Id.*

Recently the court of appeals, considering the reliability of the second sample provided to DUI defendants, held:

> [S]ince one of the purposes of requiring that a second sample be provided is to impeach the state's test, defendants must be able to rely on the test results obtained from those samples. Therefore,

the state must provide a reasonably reliable second sample. *State v. Harrison*, 157 Ariz. 184, 186, 755 P.2d 1172, 1174 (Ct.App.1988). To provide a reasonably reliable second sample, *Harrison* required the state to comply with DHS regulations regarding the capture device.

The parties in the present case take square aim at the *Harrison* principle. Alday points out that the testimony and the literature support the trial judge's finding that the silica gel method of capture, preservation, and testing is inherently and unavoidably less accurate than the Intoxilyzer test used by the state. Thus, Alday argues, the state has failed to comply with *Harrison*'s dictate that due process requires that a defendant be provided with a reasonably reliable sample. Therefore, the results of Alday's Intoxilyzer test must be suppressed. The state agrees that the silica gel method is not reasonably reliable,[3] but argues that *Baca* should be overruled and the state should not be required to supply DUI defendants with a second sample at all. In the state's view, the requirement that it provide defendants with second samples is a useless act, given the accuracy of the primary breath testing methods, the decisions of other courts, and decisions of this court in non-DUI cases. Thus, the state argues, the trial judge should not have suppressed the evidence of the Intoxilyzer results.

To choose between these positions, we must first look briefly at the reliability of the tests in question, then focus on the nature of that elusive concept—due process—and apply the legal principle derived to the facts of this case.

## C. The Reliability of the Testing Devices

### 1. *The Intoxilyzer*

As noted earlier, the Intoxilyzer analyzes the breath sample without destroying it through a process of infrared spectroscopy, thus determining the amount of ethyl alcohol present in the sample. Several factors may affect the accuracy of the Intoxilyzer test results: random error, radio frequency interference, mouth alcohol, chemical interference, insufficient alveolar samples, and operator error. However, the Model 5000 Intoxilyzer, the device used in this case (and the one most commonly used), has a number of mechanisms intended to guarantee the accuracy and reliability of test results. The device gives the operator step-by-step instructions on proper operation and invalidates the test if it is incorrectly administered. The device protects itself against radio frequency interference and can also detect and report chemical interference. The machine can detect mouth alcohol and invalidates the test when it does. Finally, the instrument will indicate when the breath sample is deficient for lack of deep lung air. Given these safeguards, plus the regulatory safeguards described, Intoxilyzer test results are considered extremely accurate.

### 2. *Reliability of the Silica Gel Method of Breath Capture*

The state contends that silica gel cannot provide a referee sample to the Intoxilyzer test used by the state. The state defines a referee sample as one at least as accurate and reliable as the primary sample, so it can be used to challenge the validity of the primary test. The state argues that it should not be required to give DUI defendants a sample of their breath because it would not be reliable enough to allow the defendant to challenge the state's results.

To support its argument that silica gel is unreliable, the state presented the testimony of three expert witnesses in the area of blood alcohol testing: Lucien Haag, Quentin Peterson, and Chester Flaxmayer. These experts agreed that the silica gel method is not as accurate and reliable as the Intoxilyzer.[4]

---

**3.** Other representatives of the state have argued in recent cases that silica gel *is* a "reasonably reliable" method of breath capture. *See, e.g., Davy v. Winkler*, No. CV–90–0079–SA (Ariz.Sup. Ct., *jurisdiction declined* May 1, 1990); *Keller v. Arizona Court of Appeals*, No. CV–90–0054–SA

(Ariz.Sup.Ct., *jurisdiction declined* April 3, 1990).

**4.** The testimony was in the form of transcripts of testimony given by these experts in two prior cases, *State v. Ericson*, Pima County Superior

The testimony of these experts does not support the conclusion that silica gel testing provides no means by which a DUI defendant can challenge the accuracy of the state's sample. For example, although acknowledging that problems exist with the silica gel method, and stating that silica gel cannot provide a referee sample (Flaxmayer, Exhibit D, Pt. 1, at 64), Mr. Flaxmayer testified that he believes silica gel can meet DHS standards (Flaxmayer, *id.* at 48, 62).

Mr. Flaxmayer also stated that "if everything is done perfectly on both sides, breath test and second sample, the two should be as reliable and agree." (Flaxmayer, *id.* at 82.) Mr. Peterson appears to agree with Mr. Flaxmayer. Mr. Peterson was asked, "Do you think that from a scientific point of view ... that any second sample capture of breath would be able to guarantee a defendant a reasonably reliable retest?" He testified in *State v. Christopher* that it could, "[t]hat the retest, although not guaranteeable to the same standards of accuracy [a]s the [primary] test would still provide a substantial amount of evidence that would verify the test result [but] [i]n terms of it going to the original level of accuracy, would not be guaranteed." Peterson, Exhibit B, at 29–30. He further testified that, in his opinion, he did not believe silica gel is substantially worse than any other second sample breath capture. *Id.*

### 3. *Admissibility—the Frye Test and the Harrison Rule*

■ The parties argue[5] in their briefs that the dispute over the validity of the silica gel test renders evidence of blood alcohol concentration derived from that test inadmissible because it fails to satisfy the standard articulated in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). Under *Frye*, evidence derived from application of a scientific principle or process is admissible if the principle or process has gained general acceptance in the particular field in which it belongs. *See State v. Roscoe*, 145 Ariz. 212, 219, 700 P.2d 1312, 1319 (1984) (citing *Frye*, 293 F. at 1014). "General acceptance" does not necessitate a showing of universal or unanimous acceptance. *See State v. Superior Court*, 149 Ariz. 269, 279, 718 P.2d 171, 181 (1986). No requirement exists that the scientific principle or process produce invariably accurate, perfect results. *Id.* The question is not whether the scientific community has concluded that the scientific principle or process is absolutely perfect, but whether the principle or process is generally accepted to be capable of doing what it purports to do. Any lack of perfection affects the weight the jury may wish to accord the evidence obtained by the silica gel test, not its admissibility. *See State v. Olivas*, 77 Ariz. 118, 267 P.2d 893 (1954). The evidence in this case does not support the conclusion that the silica gel method is so lacking in scientific reliability that the results of a properly performed and preserved test are inadmissible.

■ We acknowledge, nevertheless, that based on the testimony offered from the three experts presented in this case, it would be possible to conclude, as the trial judge evidently did, that silica gel testing is less reliable than the Intoxilyzer test. The parties conclude from this testimony that the silica gel test can never satisfy the requirements of *Baca* and *Harrison*. We believe that this conclusion is based on a basic misinterpretation of the holding in *Harrison*. *Harrison* holds only that the state must provide a "reasonably reliable" second sample. 157 Ariz. at 186, 755 P.2d at 1174. The experts in this case interpreted "reasonably reliable" as requiring the state to provide a referee sample. How-

Court No. CR–26133 (Exhibit D), and *State v. Christopher,* Tucson City Court No. 9815040 (Exhibit B); and an affidavit by Lucien Haag dated October 3, 1989. *See, e.g.,* Flaxmayer, Exhibit D, Pt. 1, at 64 (silica gel cannot provide a referee sample); Peterson, Exhibit D, Pt. 2, at 13 (silica gel can only be guaranteed to a twenty percent level of accuracy, although most tests will be within ten percent); Haag, Exhibit D, Pt. 4, at 87–88 (silica gel is not capable of providing a referee sample for purposes of impeaching the original test).

5. *See* Petition for Special Action pp. 36 and 68; Exhibit A: Motion to Suppress p. 4.

ever, that is not what *Harrison* requires. *Harrison* states:

> In order for a defendant to meaningfully impeach the state's test, he must be able to rely on the test results obtained on the second sample. *In fact, the admissibility of the second sample results may depend entirely upon the issue of whether or not the state has complied with the Department of Health Services regulation....* We hold that ... defendants must be able to rely on the test results obtained from those samples. Therefore, the state must provide a reasonably reliable second sample.

*Id.* (citations omitted, emphasis added). In other words, *Harrison* merely requires that the second sample be "reasonably reliable" and that to be reasonably reliable, it must satisfy the DHS regulations.

DHS regulations require breath preservation methods to initially meet a plus or minus five percent error rate to be certified. DHS has certified the silica gel method of breath collection for use in Arizona. *See* DHS Regulation R9–14–404(G). Therefore, presumably silica gel, when tested, satisfied the DHS requirements. Because the DHS regulations contain a provision for decertification of breath testing and collection devices upon specific findings that the device is not accurate or is unreliable (*see* DHS Regulation R9–14–404(E)), we will assume that the silica gel method still satisfies the DHS requirements. There is therefore no evidence the test is not "reasonably reliable" as required by *Harrison.*

We turn then to consider the due process requirements regarding measurement of blood alcohol content.

### D. The Demands of Due Process

■ This court's immersion in the subculture of DUI practice has not been entirely satisfactory. When reading our cases, it is difficult to escape the impression that at times, rather than deciding the real issue—the minimum fairness required by concepts of due process of law—we have solved the immediate problem at hand by relying on what is a good way, or a fair way, or the fairest way of handling a particular problem.

This court, however, has no brief to decide what is the most fair method of breath testing and to instruct law enforcement agencies to proceed accordingly. We have power only to determine the minimal requirements raised by the federal and state constitutions and to prohibit admission of evidence or conviction of crime when those requirements are not met and the constitution would thus be violated.

When discussing due process, the framers of the constitution, as in most other instances, chose general rather than specific language. The term "due process of law" is certainly easier to articulate than to define. As Justice Cameron previously noted:

> There is probably no more nebulous and indefinable concept in the law than "due process of law." Generally speaking, the denial of due process is a denial of "fundamental fairness, shocking to the universal sense of justice."

*Oshrin v. Coulter,* 142 Ariz. 109, 111, 688 P.2d 1001, 1003 (1984) (citations omitted).

Even with so broad a definition of due process, Alday's argument in this case fails. Whatever may be said of the various scientific theories advanced in favor of one device over another, it is difficult to conclude that the process followed in the case before us denied "fundamental fairness" to the extent it shocked some "universal sense of justice." The device used for the state's test was one of the best primary testing devices available. The machine is checked before and after the test, on a regular schedule, the results of which are available to the defendant. Checklists are developed, certified, and presumably followed. The machine is programmed to detect error and invalidate test results when such error appears. The defendant is given the opportunity to inspect the records, the test results, to cross-examine the operator, and to check in every way possible the accuracy of the state's test.

In addition, Alday was given an independent sample he could submit to an independent laboratory for testing. The results of

such a test could be used to contradict the results of the state's test. It may be true that the current methodologies for breath preservation tests do not rise to the same level of accuracy as the methodology that is currently employed in primary tests. This discrepancy, however, does not result from the prosecution's efforts to damage or failure to protect the defendant's case but merely from the inherent difference between primary testing and breath preservation for secondary testing. The constitution does not require law enforcement agencies to adopt a less reliable test for their own purposes so they can give the defendant the benefit of the more reliable independent test. Nor does the constitution require the sample provided to the defendant to be a referee sample to be considered "reasonably reliable." To the extent that *Harrison* appears to hold otherwise, it is disapproved.

We therefore reject Alday's basic contention that the system used by the City of Tucson in this case was so fundamentally unfair that it violates due process and requires suppression of the test results. Indeed, if anything, the system seems quite fair, or at least as fair as is possible given the present state of technology with regard to blood alcohol testing. Nor do we accept the state's proposition that the *"Baca* sample" given Alday is useless because it is not as reliable as the Intoxilyzer. As noted, the weight to be given the results is for the jury and is to be considered in light of all other evidence in the case.

We turn now to consider the state's argument relating to *Baca* and its progeny.

E. Should the Cases Requiring Independent Samples be Overruled?

The state points out that subsequent to our decisions in *Scales* and *Baca*, the United States Supreme Court held that the due process clause of the fourteenth amendment does not require the state and its agencies to preserve breath samples of DUI defendants for independent testing.

*See California v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). Thus, the state argues, much of the underlying rationale of *Scales* and *Baca* and many of the authorities cited or relied on by those cases are no longer viable. This is even more apparent, the state contends, in view of the United States Supreme Court's recent decision in *Arizona v. Youngblood,* 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), holding that due process requires the prosecution to collect, preserve, and present to the defendant only evidence that has actual and apparent exculpatory value, not evidence that is only potentially exculpatory. *Id.* at 56 n. *, 109 S.Ct. at 336 n. **.

We believe *Youngblood* is inapposite. That case dealt with the destruction of clothing containing semen stains, and as the Court noted, "unlike in *Trombetta,* the state did not attempt to make any use of the materials in its own case in chief." *Id.,* 488 U.S. at 56, 109 S.Ct. at 336. In the case before us, like *Trombetta* but unlike *Youngblood,* the state did use "the materials"—the defendant's breath and its test results—in its case in chief. Blood alcohol test results in a § 28–692(B) prosecution are not merely "potentially useful" evidence, they are virtually the entire evidence. A person may not be convicted of a violation of subsection (B) without evidence of chemical analysis of blood, breath, or urine showing a BAC in the proscribed range. *State v. Superior Court,* 149 Ariz. at 279, 718 P.2d at 181 (1986).

Nor do we believe our cases are necessarily in conflict with *Trombetta. Trombetta* concluded that due process was not violated by the state's failure to capture and preserve the breath discharged from the Intoxilyzer in the context of the procedure used in California DUI cases.[6] We recently held that a similar methodology in Arizona satisfies due process. *See State ex rel. Dean v. City Court,* 163 Ariz. 510, 789 P.2d 180 (1990) (due process was not

---

6. Under California law, DUI suspects are given the choice between a blood test, a urine test, or a replicate breath test *at state expense. Trombetta,* 467 U.S. at 482 n. 2, 104 S.Ct. at 2530 n. 2.

California also permits an accused drunken driver to have an independent blood alcohol test performed at his own expense. *Id.* at 490 n. 11, 104 S.Ct. at 2535 n. 11.

violated where defendant was given choice between replicate breath test with no sample saved and blood test at state expense); *see also Oshrin,* 142 Ariz. at 113, 688 P.2d at 1005.

■ We have no doubt that other methodologies might also pass muster under the due process clause. For instance, the state argues that replicate testing[7] using an Intoxilyzer is so fundamentally reliable and accurate that concepts of fundamental fairness would require nothing further and no independent sample would be needed. However, mere capture and delivery to the defendant of a sample in the state's possession that otherwise would be discharged and dissipated is not an onerous burden on the state. Although the state may be correct in arguing that due process does not require an independent sample when the primary test consists of replicate testing on the Intoxilyzer, we will leave decision on that issue to the day it is presented.

Finally, we distinguished and commented on *Trombetta* in *Oshrin,* 142 Ariz. at 112–13, 688 P.2d at 1004–05, and *Montano,* 149 Ariz. at 390 n. 3, 719 P.2d at 276 n. 3. Nothing in the facts before us makes it necessary to decide today whether those cases, plus *Baca* and *Scales,* need be overruled. Those cases do not hold that due process requires the police to prepare the defendant's case and to collect and preserve evidence for the defendant. Although it might be more fair if, in investigating crime, the police collected and preserved all evidence, due process does not require the police to follow the most fair method; it only prohibits methods that are fundamentally unfair. However, it is one thing to say that the police need not prepare the defendant's case, and it is quite another to say that principles of fundamental fairness permit the police to knowingly destroy or dissipate that which they systematically obtain for their own testing and evidentiary use, especially when they may keep such evidence without any significant

burden and are aware the evidence may be of value to the defense.

## CONCLUSION

Under the present state of scientific knowledge, the silica gel preservation method to capture a DUI defendant's breath specimen and preserve it for independent testing is not so unreliable that its use violates due process of law. In general, with a proper foundational showing, results of the test of the sample preserved by the silica gel methodology would be admissible under the *Frye* test and the *Harrison* rule. The trial court's conclusion that the silica gel testing method was inherently "invalid" is therefore unsupported, and the consequent suppression of the Intoxilyzer results was an abuse of discretion.

We therefore grant the ultimate relief requested by the state: the minute order of July 3, 1989 suppressing the Intoxilyzer result is vacated; the stay is dissolved; the case may proceed in a manner consistent with this opinion.

GORDON, C.J., and CAMERON, J., concur.

MOELLER, Justice, specially concurring.

The trial court held that the use of the silica gel method to capture the second sample violated the defendant's due process rights. Accordingly, the trial court suppressed the intoxilyzer results, believing suppression to be required by our cases. The validity of this suppression order is the single issue presented in this special action. In section D of the opinion, the majority holds, correctly I believe, that defendant's due process rights were not violated by use of the silica gel method. This holding disposes of the case. I would have the opinion say no more, recognizing the accuracy of the majority's observation that "[t]his court's immersion in the subculture of DUI practice has not been entirely

---

7. Replicate breath testing is a series of two consecutive breath tests spaced by air blanks to flush out the sample chambers. A reading is taken of each of the two samples and the vari-

ance between the two must be within .02 percent for the test to be valid. *See* Haag, Exhibit D, Pt. 4, at 41–42.

satisfactory." Majority op. at 487, 799 P.2d at 828.

Once the single issue in this case is resolved, there is no reason to add to the opinion, unless the court wishes to accept the parties' invitation to reexamine and perhaps overrule our earlier cases on this subject in light of later cases such as *Youngblood* and *Trombetta*.[8] I agree with the majority that "[n]othing in the facts before us makes it necessary to decide today whether those cases [*Oshrin* and *Montano* ], plus *Baca* and *Scales*, need be overruled." Majority op. at 489, 799 P.2d at 830. Because the majority and I are in agreement that we should not reach such issues in this case, I note my position that the statements and observations contained in section E of the majority opinion are dicta having no application to this or any other case.

In conclusion, because the record shows that the defendant's due process rights were not violated, I agree that the order of suppression should be reversed.

CORCORAN, Justice, dissenting:

Since this is not an adversarial proceeding in that both parties have concluded that the silica gel test is unreliable, I believe we should dismiss review as improvidently granted and deny the petition for review. I note that the majority points out in footnote 3 that this court has recently declined jurisdiction in two cases in which the "reliability" issue has been adversarially presented.

In addition, I believe we should review the continued vitality of *Baca* in light of *Trombetta* when that issue is presented in an appropriate case.

---

**8.** *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). *California v.* *Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).